# EXHIBIT B

Michael X. McBride, Esq. (Bar No. 011921978)
Brendan Judge, Esq. (Bar No. 021561991)
CONNELL FOLEY LLP
56 Livingston Avenue
Roseland, New Jersey 07068
973-535-0500
973-535-9217 (fax)
*Attorneys for Plaintiff/Fourth-Party Defendant*
*Toll JM EB Residential Urban Renewal LLC and*
*Fourth-Party Defendant, Lexon Insurance Company*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TOLL JM EB RESIDENTIAL URBAN RENEWAL LLC, <br><br> Plaintiff, <br><br> v. <br><br> TOCCI RESIDENTIAL, LLC, TOCCI BUILDING CORPORATION d/b/a TOCCI BUILDING COMPANIES, and JOHN L. TOCCI, SR., <br><br> Defendants. | Civil Action No. 3:16-cv-05422 (PGS/TJB) <br><br> **AMENDED COMPLAINT** |
| TOCCI RESIDENTIAL, LLC, <br><br> Third-Party Plaintiff, <br><br> v. <br><br> C&S FOUNDATIONS, INC. <br> 81 Dock Avenue <br> Waretown, NJ 08757, <br><br> CENTRIM ELECTRIC, INC. <br> 425-B Route 34 <br> Matawan, NJ 07747, <br><br> F.M. HOME IMPROVEMENTS, INC. <br> 3125 State Highway 10 East <br> Denville, NY 07834, | |

MICHAEL J. WRIGHT CONSTRUCTION
CO., INC.
16 Madison Ave., Bldg. 1, Suite C
Toms River, NJ 08753,

METROCORP PLUMBING
25 Arnold Blvd.
Howell, NJ 07731,

P&B PARTITIONS INC.
426 Commerce Lane
West Berlin, NJ 08091

QUICK RESPONSE FIRE PROTECTION,
INC.
566 Halls Main Rd.
Freehold, NJ 07728,

T.J. FALVO MECHANICAL, INC.
430 Wet Delilah Road
Pleasantville, NJ 08232,

VIP CONSTRUCTION SERVICES, INC.
15 Fresh Ponds Road
Monroe Township, NJ 08831,

    Third-Party Defendants.

METROCORP PLUMBING, INC.

    Third-Party Defendant/
    Fourth-Party Plaintiff

    v.

TOLL JM EB RESIDENTIAL URBAN
RENEWAL LLC;

LEXON INSURANCE COMPANY
10002 Shelbyville Rd.
Louisville, KY 40223;

and XYZ Corporations 1-10 and/or John Does

-2-

1-10 (representing parties that may have an
interest in the property but whose identities
are presently unknown),

                    Fourth-Party Defendants.

Plaintiff, Toll JM EB Residential Urban Renewal LLC ("Toll"), by way of Amended

Complaint against defendants, Tocci Residential LLC ("Tocci Residential"), Tocci Building

Corporation d/b/a Tocci Building Companies ("Tocci Building Corporation") and John L. Tocci,

Sr. ("John Tocci") says:

## THE PARTIES

1.      Toll is a limited liability company organized under the laws of the State of

Delaware, whose principal place of business is located at 250 Gibraltar Road, Horsham,

Pennsylvania, 19044.  Toll is the owner of certain real property located at Old Bridge Turnpike

and Tices Lane in East Brunswick, Middlesex County, New Jersey (the "Property").

2.      Tocci Residential is a limited liability company located at 660 Main Street,

Woburn, Massachusetts 01801, which holds itself out to be a construction management

company.

3.      Tocci Building Corporation is a corporation located at 660 Main Street, Woburn,

Massachusetts 01801, which holds itself out to be a construction management company.

4.      Upon information and belief, Tocci Building Companies is not a registered

business entity.

5.      Upon information and belief, Tocci Building Corporation is doing business as

Tocci Building Companies.

-3-

6.     Tocci Building Corporation and Tocci Building Companies are the same entity. (Ex. A, Wehring Tr. at 183).

7.     John Tocci is an individual who, upon information and belief, resides at 4 Solomon Pierce Rd, Lexington, MA 02420 and is the Manager of Tocci Residential and the President, Treasurer and Director of Tocci Building Corporation.

## NATURE OF THE ACTION

8.     Toll and Tocci Residential are signatories to a Construction Management Agreement, pursuant to which Tocci Residential obligated itself to serve as construction manager for a residential development located at the Property known as the Golden Triangle Project (the "Project"). On March 2, 2016, Toll terminated Tocci Residential for default as a result of Tocci Residential's gross mismanagement of the Project. By this action, Toll seeks damages, including liquidated damages from Tocci Residential for breach of contract. Toll also seeks damages, including liquidated damages, from Tocci Building Corporation because, as a matter of law, it shares with Tocci Residential the Construction Manager's obligations under the Construction Management Agreement. Toll also seeks a declaratory judgment declaring that Toll lawfully terminated the Construction Manager for default. Toll also seeks damages from Tocci Building Corporation because Tocci Residential acted as Tocci Building Corporation's alter ego, and the corporate veil should be pierced to prevent both fraud and injustice. Finally, Toll seeks damages from Tocci Residential, Tocci Building Corporation and John Tocci for fraud.

## FACTS COMMON TO ALL COUNTS

### A. The Construction Management Agreement

9. On or about December 27, 2013, Toll as Owner and Tocci Residential as Construction Manager entered into a Construction Management Agreement (the "CM Agreement"), pursuant to which the Construction Manager obligated itself to provide pre-construction and construction services (the "Services") as an at-risk construction manager for the Project. The Project was to be a new Class A luxury rental apartment complex located directly off of Route 18 in East Brunswick, NJ, consisting of a wood frame structure, partitioned into 6 buildings. The complex was to contain 400 dwelling units, a clubhouse, courtyards, and a 5-story pre-cast concrete garage.

10. Pursuant to the CM Agreement, the Construction Manager accepted a relationship of trust and confidence with Toll.

11. The final Guaranteed Maximum Price ("GMP") for the Project was $57,903,889.00. The Construction Manager was to be compensated for its Services by way of payment of its General Conditions Costs (the "GC Costs") and a Fee (the "Fee"). The GC Costs were a lump sum amount of $2,933,950.00 and the Construction Manager's Fee was fixed at $1,645,744.00. The GC Costs were to be paid monthly by dividing the total GC Costs by the number of months indicated in the Project Schedule. The Fee was to be paid monthly based on the percentage of completion of the Work.

12. As part of its Services, the Construction Manager was responsible for managing all aspects of construction of the Project. Those duties included but were not limited to:

-5-

- performing its Services in connection with the Project in an expeditious and economical manner, and in strict and complete compliance with: (1) the contract documents; (2) applicable laws pertinent to the means and methods of performing the work; and (3) acceptable construction industry standards and practices;

- causing the trade contractors to perform all work in conformity with the Contract Documents;

- using best efforts to furnish efficient business administration with emphasis on budget control, scheduling, coordination of the work and performing the work in an expeditious and economical manner consistent with the interests of Toll, particularly meeting the GMP and project schedule;

- developing and maintaining a climate of understanding and good will with all governmental entities;

- using best efforts to minimize the costs of the work ;

- reviewing the design documents on a periodic basis during their development by the architect to advise Toll regarding: (1) proposed site use, logistics and improvements; (2) selection and availability of materials, building systems and equipment; (3) methods of Project delivery; (4) long lead-time items; (5) potential areas of trade conflict; (6) value engineering recommendations; (7) possible economies, (8) constructability; and (9) completeness of the design documents;

- managing the bidding and award process for all trade contracts;

- preparing an initial cost forecast with monthly updates provided to Toll;

- preparing and updating the project schedule including a two-week look ahead schedule regularly and not less than one (1) time per month;

- preparing and submitting monthly job progress reports, monthly submittal schedules, timely review for constructability and conformity with the contract documents all shop drawings, samples, catalog cuts and other submittals provided by trade contractors;

- properly coordinating purchase orders and procurement logs to ensure the timely delivery of critical materials;

- inspecting, managing and coordinating the work of all trade contractors;

-6-

- administering the payment and change order process;

- replacing and correcting defective work without an increase in the GMP;

- promptly and diligently performing, or causing to be performed, the work in strict accordance with the project schedule approved by Toll;

- timely performance of its obligations in accordance with the Project Schedule was of the essence;

- assignment of key employees, including a Project Executive, the Senior Project Manager, the Project Manager, the Project Engineer and the Project Superintendent, at agreed upon percentages, not to be replaced or reassigned without prior written consent of Toll; and

- warranting to return to the site to replace and repair defective work for one (1) year.

13.     The Project Schedule, prepared by the Construction Manager, contemplated Substantial Completion of the Project within twenty-one (21) months of the issuance of the Notice to Proceed.  In addition to Substantial Completion and Final Completion milestones, the Project Schedule included an Amenities Delivery Date within fifteen (15) months of the Notice to Proceed.

14.     Toll issued a Notice to Proceed for the Project effective February 27, 2014.

15.     The original Final Completion Date per the Project Schedule was October 19, 2015.

16.     The Final Completion Date was subsequently extended by agreement to November 19, 2015.

17.     The original Amenities Delivery Date was April 23, 2015.

-7-

18.     The Amenities Delivery Date was subsequently extended by agreement to May 23, 2015.

**B.      The Construction Manager's Mismanagement of the Project**

19.     As a result of the Construction Manager's poor planning, gross mismanagement and significant workmanship issues the Project suffered greatly.

20.     Due to critical and continued missteps on the part of the Construction Manager, the Project continued to be significantly delayed.

21.     There were countless delays to the Project Schedule, each of which was caused and/or exacerbated by the Construction Manager's failure to properly prosecute and manage the Work.

22.     Examples of the Construction Manager's mismanagement, include, but are not limited to, its failure to install the required perimeter drains in basement areas, necessary for the installation of the foundation walls and failure to timely provide the Township of East Brunswick (the "Township") with the necessary shop drawings for the trusses for the framing work required to obtain building permits. Consequently, the framing work started August 2014 instead of May 2014.

23.     Further, the Project was affected by significant workmanship issues, including, but not limited to, the Construction Manager's failure to properly install the building envelope due to deficient installation of the primary weather resistive barrier (Zip System) and deficient installation and sealing of the windows in all five buildings constructed at the time.

24.     In addition, in Building 1, Building 2A and Building 4, the Construction Manager failed to properly backfill with and manage and compact the soils onsite, including the back

-8-

filling of basement walls with the proper structural bracing, in accordance with the recommendations of the geotechnical engineer of record, leading to slab settlement.

25. Further, Stop Work Orders were issued in August 2015 for portions of Buildings 2A and 4 due to settlement and damaged underground utilities.

26. The Construction Manager and its sprinkler contractor failed to provide sprinklers in the attic areas where there were flat roofs in each building. During inspection, the Township official did not observe sprinklers and stopped Work at the 4th floor of the buildings because of life/safety issues until the sprinklers were installed.

27. The Construction Manager failed to provide Toll with the necessary information to obtain a full building permit in a timely manner, which impacted the Construction Manager's ability to maintain its own construction schedule.

28. The Construction Manager breached its obligations to review the design and construction documents for constructability and compliance with applicable building codes, and to obtain and review for constructability any inconsistencies between submittals and the Contract Documents, causing, among other issues, the Construction Manager to fail to discover during the pre-construction stage that the hot water heaters were too large for the mechanical closets.

29. The Construction Manager failed to deliver a qualified team capable of managing the Project and to facilitate the performance and completion of the Work in the most expeditious and economical manner, as there was constant staff turnover that was unable to handle the administrative requirements of the CM Agreement and to manage the work of the trade contractors.

-9-

30.     The Construction Manager failed to maintain a climate of understanding and good will with governmental entities and even ignored the written Stop Work Order and continued working.

31.     The Construction Manager failed to properly manage the Work to ensure that it was free from defects, for example:

- Wire mesh was not installed correctly in the concrete slabs;

- Secondary electrical conduit discharging water onto electrical equipment;

- Unit balcony membrane was never installed;

- RC channels were installed upside down;

- Two hour shaft in Building 1 incorrectly installed an all four floors;

- Duct not installed on Building 2;

- Temporary weather protection never installed.

32.     On January 29, 2016, East Brunswick Township issued a Stop Work Order for all vertical construction due to the Construction Manager's poor workmanship practices.

33.     The Construction Manager ignored that Stop Work Order and continued working.

34.     On February 8, 2016, the Township issued a Notice of Violation & Order to Terminate for failure to comply with the original Stop Work Order.

35.     Finally, the Construction Manager began to demobilize and abandon the Project in early February 2016.

36.     These issues are rooted in the Construction Manager's complete inability to properly manage and prosecute the Work and its constant staff turnover.

-10-

37. Finally, on March 2, 2016, faced with at least a fourteen (14) month delay as a result of the Construction Manager's mismanagement of the Project, no adequate response to a February 5, 2016 Notice of Default, and the Construction Manager's continued failure to diligently prosecute the Work and its Services under the CM Agreement, Toll terminated the Construction Manager for default pursuant to Article 16 of the CM Agreement.

38. Following the Construction Manager's termination, Toll engaged another construction manager to manage completion of the Project at significant increased costs to Toll.

39. The replacement construction manager completed the Project in June of 2018, 30 months later than the November 19, 2015 Final Completion Date.

**C. There Is No Distinction Between Tocci Residential And Tocci Building Corporation**

40. There is no distinction between Tocci Residential and Tocci Building Corporation.

41. While Tocci Residential signed the CM Agreement, Tocci Residential and Tocci Building Corporation each share the obligations of the Construction Manager under the CM Agreement.

42. Each considered itself to be the Construction Manager of the Project without any distinction between the two entities.

43. The CM Agreement incorporates Tocci Building Corporation by reference as the Construction Manager.

44. The CM Agreement refers to "Tocci Building Corporation" as the "Construction Manager for the Toll/Edgewood Apartments project ('Project')."

-11-

45. Tocci Residential and Tocci Building Companies are both located at 660 Main Street, Woburn, Massachusetts 01801.

46. Tocci Residential does not have a website.

47. Tocci Building Corporation does have a website.

48. Tocci Building Corporation promoted its work on the Project on the Tocci Building Corporation website. (Ex. B).

49. Both Tocci Residential and Tocci Building Corporation have the same leader at the helm.

50. Specifically, upon information and belief, John Tocci, Sr. is the Manager of Tocci Residential and the President, Treasurer and Director of Tocci Building Corporation.

**1. All Of The Construction Manager's Employees On The Project Were Employed By Tocci Building Corporation, Not Tocci Residential**

51. All of the Construction Manager's employees on the Project were employed by Tocci Building Corporation. (Ex. A, Wehring Tr. at 134-135, 145).

52. Tocci Residential had no employees working on the Project.

53. At all relevant times, Tocci Residential had no employees.

54. Throughout the duration of the Project, everyone who was purported to be a Tocci Residential employee was actually employed by and paid by Tocci Building Corporation. (Ex. A, Wehring Tr. at 134-135, 145).

55. Moreover, the CM Agreement contained a provision identifying the "Key Employees" of the Construction Manager who would have primary responsibility for implementing the Construction Manager's obligations under the CM Agreement.

-12-

56. The "Key Employees" of the Construction Manager were identified in Exhibits H and I to the CM Agreement.

57. Each "Key Employee" of Construction Manager also signed a Key Employee Affidavit that was attached to the CM Agreement as Exhibit I and made a part thereof.

58. In executing the Key Employee Affidavits each employee certified that he worked for the Construction Manager of the Project.

59. Each of the "Key Employees" certified that the Construction Manager for whom he worked was Tocci Building Corporation.

60. Tocci Building Corporation's website further clarifies that it, and not Tocci Residential, hired the people performing the construction management work on the Project.

61. For example, the Tocci Building Corporation website announced that Raymond Barker, one of the "Key Employees" identified in the CM Agreement, was hired by Tocci Building Corporation to oversee construction of the Project. (Ex. C).

62. The Tocci Building Corporation website also announced the hiring of Glynda Wehring to oversee construction of the Project. (Ex. D).

63. Ms. Wehring was paid by Tocci Building Corporation. (Ex. A, Wehring Tr. at 21).

64. Ms. Wehring was also Tocci Residential's 30(b)(6) witness on its alleged damages in this litigation.

65. Ms. Wehring is not a Tocci Residential employee.

-13-

66.     The Tocci Building Corporation website also identifies its "Executive Team", (Ex. E), three of whom (Joe Cavallaro, Joe Ferolito and Bob Tierney) were identified as the "Key Employees" for the Construction Manager for the Project in the CM Agreement.

67.     Exhibit M of the CM Agreement, entitled "Construction Manager's Schedule of Hourly Rates", identifies the Construction Manager's employees and their hourly rates.

68.     The people identified in exhibit M of the CM Agreement were employees of and paid by Tocci Building Corporation.  (Ex. A, Wehring Tr. at 134-135, 145).

**2.     Tocci Building Corporation, Not Tocci Residential, Obtained The Required Insurance**

69.     The CM Agreement required the Construction Manager to maintain certain insurance.

70.     Tocci Building Corporation, not Tocci Residential, obtained the required insurance and prorated the premiums amongst its various projects, one of which was the Project that is the subject of the CM Agreement.

**3.     Tocci Building Corporation Held Itself Out To Public Authorities That It Was The Construction Manager**

71.     Tocci Building Corporation held itself out to public authorities that it was the Construction Manager.

72.     The Project required that the Construction Manager to interact with the Township and other local authorities.

73.     Tocci Building Corporation held itself out to the Township as the Construction Manager for the Project.

-14-

74.     As a result of Tocci Building Corporation's holding itself out as Construction Manager of the Project, when the Construction Manager violated the construction code, the Township issued various Notices of Violation and Stop Construction Orders to Tocci Building Corporation, not Tocci Residential.

75.     For example, on May 13, 2015, the Township issued a Notice and Order of Penalty to Tocci Building Corporation, not Tocci Residential LLC.

76.     Similarly, on August 11, 2015, the Township issued a Stop Construction Order for Building 4 on the Project to Tocci Building Corporation, not Tocci Residential LLC.

77.     Also on August 11, 2015, the Township issued a Stop Construction Order for Building 2 on the Project to Tocci Building Corporation, not Tocci Residential LLC.

78.     The Township issued a Notice and Order of Penalty to Tocci Building Corporation on January 29, 2016.

79.     Frank Bonaccorsi, Project Manager for Tocci Building Corporation, communicated with the various Township officials on behalf of Tocci Building Corporation regarding the Stop Construction Orders and Notices and Orders of Penalty.

**4.      The Construction Manager's Subcontractors, Suppliers And Vendors For The Project Were Doing Business With Tocci Building Corporation**

80.     The subcontractors, vendors and suppliers for the Project were communicating and doing business with Tocci Building Corporation rather than Tocci Residential.

81.     For example, Metrocorp Plumbing Inc. wrote directly to Frank Bonaccorsi of Tocci Building Corporation when the piping systems in the Project became distorted, twisted and broke.

-15-

5449316-1

82.     Maser Consulting, P.A., one of the largest engineering firms in New Jersey, remitted its bills directly to Tocci Building Corporation for payment for work relating to the Project.

83.     Similarly, numerous vendors/suppliers such as PSEG, Johnny on the Spot, LLC, Evergreen Recycling Solutions and Bailey's Square Janitorial Services sent their invoices directly to Tocci Building Corporation, which were received and approved for payment by Frank Bonaccorsi of Tocci Building Corporation.

**5.      Tocci Building Corporation - Not Tocci Residential – Retained, Received And Approved Payment Of The Invoices Of The Consultants/Experts For The Project**

84.     Tocci Building Corporation - not Tocci Residential – retained, received and approved payment of the invoices of the consultants/experts for the Project.

85.     Upon information and belief, Simpson Gumpertz & Heger ("SG&H") was retained by Tocci Building Corporation to provide building envelope consulting services relating to the Project.

86.     SG&H is also providing expert opinions to Tocci Building Corporation – as opposed to Tocci Residential - for this litigation.  (Ex. A, Wehring Tr. at 210).

87.     SG&H sent its bills directly to Tocci Building Corporation, not Tocci Residential.

88.     SG&H's bills were stamped "Received" by Tocci Building Corporation.

89.     SG&H's bills were approved by Frank Bonaccorsi, a Tocci Building Corporation employee.

-16-

90.     Similarly, upon information and belief, GZA GeoEnvironmental, Inc. ("GZA") was retained by Tocci Building Corporation to provide geotechnical engineering consulting services relating to the Project.

91.     GZA is also providing expert opinions to for this litigation.  (Ex. A, Wehring Tr. at 176, 210).

92.     GZA's bills were stamped "Received" by Tocci Building Corporation.

93.     GZA's bills were approved by Frank Bonaccorsi, a Tocci Building Corporation employee.

**6.      The Alleged Damages Sought In This Litigation Belong To Tocci Building Corporation, Not Tocci Residential**

94.     In the Counterclaim that Tocci Residential filed against Toll, Tocci Residential seeks millions of dollars of damages, at least several hundred thousands of dollars of which are costs allegedly incurred not by Tocci Residential but by Tocci Building Corporation.

95.     For example, Tocci Residential seeks hundreds of thousands of dollars in alleged damages for the payment of the hourly rates of nine staff members that allegedly worked on the Project.

96.     However, the staff members were all employed by Tocci Building Corporation, and were paid by Tocci Building Corporation, not Tocci Residential.  (Ex. A, Wehring Tr. at 134-135, 145).

97.     Tocci Residential also seeks reimbursement for the consulting and expert fees incurred by SG&H and GZA.  (Ex. A, Wehring Tr. at 168).

-17-

98.     However, SG&H and GZA's invoices were sent to, received, approved and, upon information and belief, paid by Tocci Building Corporation.

99.     Tocci Residential also seeks damages for money paid to certain vendors/suppliers. However, these vendors/suppliers such as PSEG, Johnny on the Spot, LLC, Evergreen Recycling Solutions and Bailey's Square Janitorial Services sent its invoices directly to Tocci Building Corporation, which were received and approved for payment by Frank Bonaccorsi of Tocci Building Corporation and, upon information and belief, paid by Tocci Building Corporation.

### 7.     Tocci Residential Was Undercapitalized

100.    Tocci Residential was originally formed on or about July 8, 2004.  (Ex. F).

101.    Tocci Residential was deactivated on May 4, 2007.  (Ex. F).

102.    Upon information and belief, Tocci Residential then reactivated on September 16, 2013, immediately prior to and for the sole purpose of entering into the $58 million CM Agreement in December 2013.

103.    Upon information and belief, Tocci Residential did not have adequate capitalization either at the time of its original formation - or when it was reactivated and signed the CM Agreement - to perform construction management services.

104.    Upon information and belief, the only construction project ever undertaken by Tocci Residential is the Project with Toll.

105.    All services provided to Toll pursuant to the CM Agreement were provided by Tocci Building Corporation's employees with the Tocci Building Corporation's financial resources.

-18-

106. There is no distinction between Tocci Building Corporation and Tocci Residential.

## COUNT ONE
### (Breach of Contract Against Tocci Residential)

107. Toll repeats and realleges that allegations set forth in the preceding paragraphs as if set forth fully herein.

108. As a result of the Construction Manager's acts and omissions set forth herein, the Tocci Residential materially breached the CM Agreement.

109. Such breach has damaged Toll.

## COUNT TWO
### (Breach of Obligation of Good Faith and Fair Dealing Against Tocci Residential)

110. Toll repeats and realleges that allegations set forth in the preceding paragraphs as if set forth fully herein.

111. The CM Agreement contains an implied covenant of good faith and fair dealing.

112. As a result of the Construction Manager's acts and omissions set forth herein, Tocci Residential has breached the obligation of good faith and fair dealing.

113. Toll has been damaged by such breach.

## **COUNT THREE**
### **(Declaratory Judgment Against Tocci Residential and Tocci Building Corporation)**

114.    Toll repeats and realleges that allegations set forth in the preceding paragraphs as if set forth fully herein.

115.    As a result of the Construction Manager's acts and omissions set forth herein, Toll is entitled to an order declaring that Toll lawfully terminated the Construction Manager for default of its obligations under the CM Agreement.

## **COUNT FOUR**
### **(Piercing The Veil/Alter Ego Against Tocci Building Corporation)**

116.    Toll repeats and realleges that allegations set forth in the preceding paragraphs as if set forth fully herein.

117.    Upon information and belief, there is a unity of interest and ownership between Tocci Building Corporation and Tocci Residential such that the separate personalities of the Tocci Corporate Defendants no longer exist.

118.    Tocci Residential was and is at all times relevant, a shell company and was organized and operated as an alter ego of Tocci Building Corporation for its business benefit and advantage and was managed solely by Tocci Building Corporation.

119.    Tocci Building Corporation has at all times herein maintained and exercised total dominion and control over the Tocci Residential.

120.    Tocci Building Corporation and Tocci Residential have so intermingled their financial affairs that Tocci Residential is the alter ego of Tocci Building Corporation.

121.    The following facts evidence that there is no separate identify of the Defendants:

-20-

- The Tocci Corporate Defendants are both located at 660 Main Street, Woburn, Massachusetts 01801;

- Upon information and belief, John Tocci, Sr. is the Manager of Tocci Residential and the President, Treasurer and Director of Tocci Building Corporation;

- Tocci Residential does not have a website;

- Tocci Building Corporation has a website and promoted the work on the Project on the Tocci Building Corporation website;

- All of the construction manager's employees on the Project worked for and were paid by Tocci Building Corporation, not Tocci Residential;

- Tocci Building Corporation, not Tocci Residential, obtained the required insurance for the Project;

- Tocci Building Corporation held itself out to the Township as the Construction Manager for the Project;

- The subcontractors, vendors and suppliers for the Project were communicating and doing business with Tocci Building Corporation rather than Tocci Residential – including submission, receipt, approval and, upon information and belief, payment of invoices;

- Tocci Building Corporation - not Tocci Residential – retained, received and approved payment of the invoices of the consultants/experts for the Project and this litigation;

-21-

- The alleged damages sought by Tocci Residential in this litigation were incurred by Tocci Building Corporation, not Tocci Residential; and

- Upon information and belief, Tocci Residential was undercapitalized.

122. Based on the above and upon information and belief, Tocci Residential failed to follow corporate formalities and/or ignored provisions of its governing documents as expected of an independent business entity.

123. Further, based upon the above Tocci Residential was nothing more than a legal fiction.

124. Tocci Building Corporation abused the privilege of incorporation by using Tocci Residential to perpetrate a fraud or injustice, or otherwise to circumvent the law.

125. Below are examples of why piercing the corporate veil is necessary to promote justice and/or stop a fraud and/or otherwise stop the Defendants from evading the law:

- Tocci Building Corporation and Tocci Residential have commingled funds and/or held themselves out as a single business or with confusing identities, to induce Toll to enter into the CM Agreement with Tocci Residential.

- Tocci Building Corporation used Tocci Residential, which, unbeknownst to Toll, did not have a genuine or separate business existence, to mislead Toll to believe that Tocci Residential rather than Tocci Building Corporation would perform the Construction Manager's obligations under the CM Agreement.

- Tocci Building Corporation created and structured Tocci Residential so as to inequitably shield Tocci Building Corporation from responsibility for the

-22-

Construction Manager's obligations under the CM Agreement while intending to reap the financial benefits of it.

- Upon information and belief, Tocci Residential was undercapitalized at the time of formation, at the time of reactivation and at the time it signed the CM Agreement.

- Upon information and belief, the only construction project ever ostensibly undertaken by Tocci Residential is the Project, which was managed for and by Tocci Building Corporation.

- By signing the CM Agreement, Tocci Residential entered into a relationship of trust and confidence with Toll and made certain misrepresentations, including that it employed various people to perform the construction management work, and that Tocci Residential was going to act as Construction Manager. Those representations were false.

- By its Counterclaim, Tocci Residential is seeking millions of dollars of damages from Toll at least several hundred thousands of dollars of which are costs allegedly incurred by Tocci Building Corporation, not Tocci Residential.

- It would be unjust and inequitable to permit Tocci Residential to proceed on its claim for damages that it has not incurred, but rather Tocci Building Corporation has allegedly incurred pursuant the CM Agreement, while shielding Tocci Building Corporation from liability for the Construction Manager's acts and omissions pursuant to the CM Agreement.

-23-

- Upon information and belief, Tocci Residential is insolvent.

126.    The veil of limited liability of Tocci Residential must be pierced to reach the owners of Tocci Residential and its alter ego, Tocci Building Corporation, to avoid fraud and/or injustice and/or otherwise evade the law.

127.    Tocci Building Corporation and Tocci Residential's owners are therefore liable for any liability imposed upon Tocci Residential in this action, and any debt owed by Tocci Residential constitutes a debt owed by Tocci Building Corporation and Tocci Residential's owners.

## COUNT FIVE
### (Fraud In the Inducement Against Tocci Residential, Tocci Building Corporation and John Tocci)

128.    Toll repeats and realleges the allegations contained in the foregoing paragraphs as if such allegations were set forth at length herein.

129.    John Tocci signed the CM Agreement on behalf of the Construction Manager.

130.    Pursuant to the specific terms of the CM Agreement, the Construction Manager accepted a relationship of trust and confidence with Toll.

131.    By signing the CM Agreement, John Tocci and the Construction Manager represented to Toll that Tocci Residential employed various people to perform the construction management work.

132.    That representation was false.

133.    Upon information and belief, at all relevant times Tocci Residential had no employees.

-24-

134. The CM Agreement specifically identified certain individuals as Key Employees of the Construction Manager.

135. Under the CM Agreement, the Key Employees were to have primary responsibility for the management of the Project.

136. None of the persons identified as Key Employees of the Construction Manager were employees of Tocci Residential either at the time the CM Agreement was executed or thereafter.

137. At all relevant times, all persons who worked on the Project on behalf of the Construction Manager were employees of Tocci Building Corporation.

138. Because they were employees of Tocci Building Corporation, not Tocci Residential, Tocci Building Corporation was able to assign them to other projects being managed by Tocci Building Corporation so that they were unable to fulfill their obligations to Toll.

139. For example, the CM Agreement identifies Bob Tierney as a Key Employee in the position of General Superintendent.

140. As such, Mr. Tierney was to dedicate 100% of his time and effort to this Project.

141. Mr. Tierney never became an employee of Tocci Residential.

142. At all relevant times he was an employee of Tocci Building Corporation.

143. Upon information and belief, Tocci Building Corporation reassigned Mr. Tierney to some other Tocci Building Corporation project.

144. Mr. Tierney rarely, if ever, dedicated any time to this Project.

-25-

145. Similarly, the CM Agreement identifies Massimo Careccia as a Key Employee in the position of Superintendent. As such Mr. Careccia was to dedicate 100% of his time and effort to this Project.

146. Mr. Careccia never became an employee of Tocci Residential.

147. At all relevant times he was an employee of Tocci Building Corporation.

148. Upon information and belief, in June of 2015, Tocci Building Corporation reassigned Mr. Careccia to some other Tocci Building Corporation project. Mr. Careccia was never replaced.

149. These and other staffing decisions, which, upon information and belief, were made by Tocci Building Corporation for its benefit, left the Project understaffed and/or staffed with unqualified personnel.

150. The understaffing of the Project and the assignment of unqualified personnel to the Project severely impacted the progress of the Project and the quality of the workmanship.

151. By signing the CM Agreement, John Tocci and the Construction Manager also represented to Toll that Tocci Residential was going to act as Construction Manager.

152. That representation was false.

153. Tocci Residential never served in the role of Construction Manager.

154. Because Tocci Residential never served in the role of Construction Manager, the progress of the Project and the quality of the workmanship were severely impacted.

155. Upon information and belief, all the Defendants knew such representations were false at the time they were made to Toll.

-26-

156.    Moreover, as a result of the position of trust created by the CM Agreement, John Tocci, Tocci Residential and Tocci Building Corporation had a duty to disclose to Toll that Tocci Residential had no employees.

157.    As a result of the position of trust created by the CM Agreement, John Tocci, Tocci Residential and Tocci Building Corporation had a duty to disclose to Toll that none of the individuals identified as Key Employees would be employed by Tocci Residential.

158.    As a result of the position of trust, John Tocci, Tocci Residential and Tocci Building Corporation had a duty to disclose to Toll that Tocci Residential lacked the capital to manage the Project.

159.    As a result of the position of trust, John Tocci, Tocci Residential and Tocci Building Corporation had a duty to disclose to Toll that Tocci Residential would not, in fact, manage the Project.

160.    As a result of that position of trust, John Tocci, Tocci Residential and Tocci Building Corporation had a duty to disclose to Toll that Tocci Building Corporation would actually perform the function of Construction Manager.

161.    Upon information and belief, Defendants made such misrepresentations and omissions with the intent that Toll rely upon them and to induce Toll to enter into the CM Agreement.

162.    Toll reasonably relied on such misrepresentations and omissions in entering into the CM Agreement which named Tocci Residential as the Construction Manager.

163.    Toll has been damaged by Defendants' fraudulent misrepresentations and omissions.

-27-

WHEREFORE, Toll demands judgment against the Defendants:

(a)    Piercing the corporate veil of the holding both Tocci Residential and Tocci Building Corporation directly liable for amounts due to Toll under the CM Agreement;

(b)    For all damages sustained by Toll including, but not limited to, liquidated damages, compensatory damages, consequential and incidental damages, punitive damages, plus interest, attorney's fees and costs as permitted by law;

(c)    For an order declaring that Toll lawfully terminated the Construction Manager for default of its obligations under the CM Agreement; and

(d)    For such other and further relief as this Court deems just and proper.

Dated: May 22, 2020          CONNELL FOLEY LLP

By:      *s/Brendan Judge*
           Michael X. McBride, Esq.
           Brendan Judge, Esq.
           Mitchell W. Taraschi, Esq.
           CONNELL FOLEY LLP
           85 Livingston Avenue
           Roseland, New Jersey 07068
           973-535-0500
           *Attorneys for Plaintiff /Fourth-Party Defendant,*
           *Toll JM EB Residential Urban Renewal LLC and*
           *Fourth-Party Defendant Lexon Insurance Company*

-28-

# Exhibit A

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
 2          CIVIL ACTION NO. 3:16-cv-05422-PGS-TJB
 3
 4   TOLL JM EB RESIDENTIAL URBAN     :
     RENEWAL LLC,
 5                                    :
                      Plaintiff,          DEPOSITION OF:
 6        -v-                         :
                                          GLYNDA WEHRING
 7   TOCCI RESIDENTIAL, LLC,          :
 8        Defendant/Third-Party       :
                 Plaintiff,
 9                                    :
          -v-
10                                    :
     C&S FOUNDATIONS, INC.; CENTRIM
11   ELECTRIC, INC.; F.M. HOME        :
     IMPROVEMENTS, INC.; MICHAEL J.
12   WRIGHT CONSTRUCTION CO., INC.;   :
     METROCORP PLUMBING; P&B
13   PARTITIONS INC.; QUICK RESPONSE  :
     FIRE PROTECTION, INC.; T.J.
14   FALVO MECHANICAL, INC.; VIP      :
     CONSTRUCTION SERVICES, INC.,
15                                    :
          Third-Party Defendants. X
16   - - - - - - - - - - - - - - - -
     (Caption continued on Page 2)
17   - - - - - - - - - - - - - - - -
18
19        TRANSCRIPT of testimony as taken by and
20   before SEVA FLICSTEIN, Certified Court Reporter,
21   Registered Merit Reporter, Certified Realtime
22   Reporter, at the law offices of CONNELL FOLEY,
23   located at 56 Livingston Avenue, Roseland,
24   New Jersey, on Tuesday, August 20, 2019, commencing
25   at 9:30 in the forenoon.
```

Page 21

```
 1   Grain & Cane Pub, Starbucks, all part of the
 2   offshoots of the Embassy Suites Hotel project.
 3   Three Journal Square project in Jersey City.
 4          Q.    So we have Embassy Suites and Three
 5   Journal Square?
 6          A.    The Commons project in Providence,
 7   Rhode Island.  Coppersmith project also in
 8   Massachusetts.  I would say that's most of it.
 9          Q.    Have you ever been employed by Tocci
10   Residential LLC?
11          A.    No.  Meaning what company is on my
12   paycheck, it's Tocci Building Company.
13          Q.    And your understanding is you've never
14   been employed by Tocci Residential LLC; correct?
15          A.    Correct.
16          Q.    In what capacity did you work on the
17   Golden Triangle project?
18          A.    I was a senior project manager.  I was
19   called in to help out Frank Bonaccorsi who was the
20   project manager on the project.  He was getting
21   inundated with cost exercises for change orders.  So
22   I joined the team to help with the field operation
23   so that he could focus more on the cost end.
24          Q.    Did you direct operations in the
25   field?
```

1 budget?

2      A.    The budget is during a specific time

3 period of the contract.

4      Q.    Was the corporate executive/regional

5 manager listed among the general conditions listed

6 in Wehring-26 Exhibit R?

7      A.    No.

8      Q.    So is it your testimony that

9 Mr. Sandonato does not fit within Exhibit R?

10      A.    That's correct.  And he was never

11 billed for during the contract period.  Even for

12 change orders, we didn't bill for his time.

13      Q.    By whom was Mr. Sandonato employed

14 during the period from October 20, 2015 to May 15,

15 2016?

16      A.    I believe he's employed by Tocci

17 Building Companies.

18      Q.    That's the entity that signed his

19 check as far as you know?

20      A.    Yes.

21      Q.    Did he receive multiple paychecks from

22 different Tocci entities?

23      A.    No.

24      Q.    Is it fair to say everybody was paid

25 by Tocci Building Companies?

Page 135

1          A.     That's my understanding, yes.

2          Q.     By whom is he an employee now?

3          A.     Tocci Building Companies.

4          Q.     The next individual is Frank

5    Bonaccorsi.  And your summary identifies him as a

6    project manager; correct?

7          A.     Yes.

8          Q.     As such was he working in the field in

9    East Brunswick?

10         A.     Yes, until I started.  And then he

11   went off-site so he could focus more on all of the

12   pricing for the change orders on the project.  But

13   he did come out to the field once or twice a week

14   after that, after August.

15         Q.     Where is he listed on Exhibit R, which

16   we marked as Wehring-26, the general conditions

17   breakdown?

18         A.     I guess he would be -- we don't have a

19   project manager, I would put him at senior project

20   manager.

21         Q.     You will agree with me that there is

22   no project manager listed within Exhibit R?

23         A.     Yeah, that's correct.  I think I

24   noticed that before.

25         Q.     Is he listed as a key employee on

Page 145

1    period by Tocci Building Companies --

2          A.    I believe so.

3          Q.    -- rather than Tocci Residential LLC;

4    is that correct?

5          A.    Yes.  I believe everybody is employed

6    by Tocci Building Companies and worked for various

7    projects.

8          Q.    By whom is Mr. Short employed now?

9          A.    He's still with Tocci.

10          Q.    In what capacity?

11          A.    Something similar.  I don't know if

12   his title is exactly the same.  I'm not sure what

13   his current title is.

14          Q.    You are the next individual listed on

15   Bates page 715 in Wehring-45; correct?

16          A.    Yes.

17          Q.    And the summary identifies you as

18   senior project manager; correct?

19          A.    Yes.

20          Q.    Were you in the field at the Golden

21   Triangle Apartments?

22          A.    I was up until the stop work order, or

23   around there, maybe a couple of days after.  Tocci

24   had an Iselin office that was more comfortable, and

25   considering that the project was under a stop work

```
 1        A.    For the most part.  There were some

 2   things that were omitted, but, yes.  For the most

 3   part, we looked at the costs we incurred after

 4   October 20.

 5        Q.    And you included all of them, didn't

 6   you?

 7        A.    No, we didn't include all of them.

 8   Some of them we didn't include.  But it was

 9   because -- it's a matter of delay as to when it hits

10   the accounting department.

11              There could have been costs for, say,

12   August or September that hit the accounting

13   department maybe in October or November for whatever

14   reason.  You know, we didn't include those.  We

15   pulled those out because it was for services during

16   the contract period.  But we were specific towards

17   services after the contract period that we included

18   here.

19        Q.    Okay.  Let's look at Wehring-4 with

20   regard to Simpson Gumpertz, Bates 249.

21        A.    Okay.

22        Q.    249 to 254 relates to Tocci's claim

23   for extended general conditions for both Simpson

24   Gumpertz and GZA Geoenvironmental Inc.; correct?

25        A.    Correct.  Was this included in the
```

```
1    weren't issues with the soil and disagreements with

2    the causes of soil-related problems, we wouldn't

3    have had this expense.

4           Q.    So if I understand your testimony,

5    Tocci retained GZA; right?

6           A.    Yes.

7           Q.    Toll didn't retain GZA?

8           A.    Correct.

9           Q.    Toll didn't authorize Tocci to retain

10   GZA; correct?

11          A.    Not to my knowledge.

12          Q.    And Tocci retained GZA in order to

13   assert a claim or defend a claim to be brought by

14   Toll with regard to the soil; correct?

15                MR. ERLANGER:  Objection; form.

16          A.    Both of these consultants were hired

17   for peer reviews.  You know, we wanted another

18   expert out to help with these problems.

19          Q.    And you are asking Toll to reimburse

20   Tocci for its expert costs; correct?

21          A.    Yes.

22          Q.    As part of Tocci's general conditions

23   cost; correct?

24          A.    That's how it's presented here, yes.

25   I suppose that could be pulled outside of general
```

1 asked our CFO to provide me, you know, the most

2 accurate backup that they could absent invoices,

3 absent job-specific invoices, and this is what he

4 gave me.

5         So you could see the list of projects

6 that Tocci had going on.  Insurance costs are all

7 based on revenue, and Golden Triangle Apartments

8 were a fraction of our overall insurance costs.  And

9 he estimated what they were and came up with 34,596,

10 which is less than I think what we were previously

11 carrying.

12       Q.   Now, in your answer to that question

13 you referred to "we" and to "our."  You are

14 referring to Tocci Building Corporation?

15       A.   I am referring to --

16       MR. ERLANGER:  Time period.

17       A.   I am referring to Tocci Building

18 Corporation and/or our chief financial officer who

19 prepared this document for me.

20       Q.   This document says Tocci Building

21 Corporation.  Is it your understanding that that

22 means Tocci Building Companies?

23       A.   Yes.

24       Q.   That that's one and the same?

25       A.   I would say so, yes.  And he prorated

1    A.    That's correct, at this point.  And

2    then we'll have an expert do their analysis and

3    present a report.

4        Q.    Right.  And this interest calculation

5    includes interest on the payments to GZA and Simpson

6    Gumpertz for the development of the expert reports;

7    correct?

8        A.    Inasmuch as that is part of line H, I

9    would say yes.

10            MR. JUDGE:  I may be done.  Let's take

11    a break.  I will just review my notes.

12            (Break taken.)

13            MR. JUDGE:  I am finished for today.

14    I reserve the right to recall the witness based on

15    the documents that are requested today.  But I will

16    turn it over to anybody else who wants to ask

17    questions of the witness.  Do we want to do it today

18    or start tomorrow?

19            MR. BUCHER:  No questions from Quick

20    Response.

21                    -----

22                EXAMINATION

23                    -----

24    BY MR. STRONG:

25        Q.    Good afternoon, Ms. Wehring.

# Exhibit B

http://www.tocci.com/2014/07/residential-toll    Go

17 captures
22 Nov 2014 - 6 Mar 2016

Nov **MAR** May
◀ **26** ▶
2014 **2015** 2016

▼ About this capture

ABOUT    APPROACH    PORTFOLIO    BLOG    CAREERS    CONTACT

# RESIDENTIAL DEVELOPMENT FOR TOLL BROTHERS

[x] Additional Courtyard

## PROJECT DETAILS

| | |
|---|---|
| Location | **East Brunswick, NJ** |
| Owner | **Toll Brothers** |
| Architect | **Barton Partners** |

## PROJECT NOTES

The 400 unit apartment, wood-framed complex includes a mix of one-bedroom, two-bedroom, and three-bedroom units adjacent to a 5-story precast garage. Residents will have access to expansive amenities, including a club room, fitness room, catering-style kitchen/service bar, and outdoor pool.

Tocci used Building Information Modeling (BIM) to virtually resolve issues prior to construction. The Tocci onsite team also used BIM to analyze and communicate schedule, safety, and logistics measures – critical components to achieve the project's phased turnover.

## ELEVATOR PITCH

Tocci Building Companies combines over ninety years of building experience with a unique collaborative process to optimize the cost.

## LATEST POSTS

**Site Seeing: Project Walk-Throughs**
When a Request for Proposal (RFP) comes through the door (or more likely our Inbox), the Tocci team kicks into high Read More [+]

## TOCCI TWEETS

VOTE TODAY! Tocci's nominated for Best Construction Blog by Construction Marketing Ideas. http://t.co/K1UnJFia7T about 1 hour ago

Case 3:18-cv-05422-PGS-TJB Document 176-1 Filed 05/22/20 Page 41 of 54 PageID: 2474

http://www.tocci.com/2014/07/residential-toll | Go

Nov **MAR** May
◄ **26** ►
2014 **2015** 2016

**17 captures**
22 Nov 2014 - 6 Mar 2016

▼ About this capture

ABOUT    APPROACH    PORTFOLIO    BLOG    CAREERS    CONTACT

c o o l  c a l m  constructed

Copyright © 2015 Tocci Building Companies. Terms of Use

# Exhibit C



ABOUT     APPROACH     PORTFOLIO     BLOG     CAREERS     CONTACT

# RAYMOND BARKER JOINS TOCCI BUILDING COMPANIES

## MEET TOCCI'S NEW TEAM MEMBER RAY BARKER

By Tocci    |    May 6th, 2014                    Categories: **Tocci Bulletin**, **Tocci in the News**

## RAYMOND BARKER JOIN TOCCI BUILDING COMPANIES

### TOCCI CONTINUES GROWTH INTO NEW JERSEY MARKET

WOBURN, MA, May 6, 2014 – Tocci Building Companies, a Boston-area construction manager and recognized leader in virtual design and construction solutions, has added Project Executive Raymond (Ray) Barker, to their growing Mid-Atlantic team. Barker will be responsible for overseeing Tocci's construction activity in the New Jersey market, with a primary focus on the Residential Development project in East Brunswick.

Barker will apply over 25 years of industry experience to manage client relationships and ensure success on Tocci's New Jersey projects. Barker will coordinate with Tocci's headquarters in Woburn, MA to consistently implement Tocci's unique BIM-enabled process on New Jersey projects. Barker will also manage the Tocci construction personnel and staff working on those projects.

"Working for Tocci is enticing to anyone who is interested in working for an industry leader in innovative construction techniques," says Barker. "I am honored to work alongside some of the industry's brightest individuals, who take pride in their work and produce exemplary results."

Barker worked for Tocci previously, from 2002 to 2006. He has worked on a variety of projects ranging from high-rise luxury apartments, to assisted senior living centers. Notably, Barker assisted in the construction of a $700 million project and he has overseen complex

## SUBSCRIBE

**Subscribe To Our Newsletter**

Email Address     Subscribe

## CATEGORIES

Tocci in the News

Tocci Bulletin

Awards

Corporate Giving

Training

Design We love

Industry News

VDC News

TocciToday

company will be an integral part of our expansion into the New Jersey region."

As a previous Tocci team member, Barker has a thorough understanding the company values as well as the structure of operations and functions required in his position. He previously worked on Tocci's Erickson Retirement Community project in Pompton Plains, NJ that was valued at $96 million and was competed 2006.

Barker was a 1980 Olympics wrestling team regional qualifier champion and collegiate All-American wrestler from 1977-78. He serves as a regional board member for the Juvenile Diabetes Research Foundation (JDRF) and holds the position of assistant coach of the Jersey Shore Youth Football.

## ABOUT TOCCI BUILDING COMPANIES

Tocci Building Companies, a leading construction management firm, is internationally recognized as a leader in Virtual Design and Construction (VDC) and Integrated Project Delivery (IPD). Headquartered in Woburn, MA, Tocci provides intelligent building solutions and construction services with an integrated approach and emphasis on sustainable construction throughout the Northeast and Mid-Atlantic United States. Tocci is proud to be celebrating 90 years of successful business partnerships. For more information visit www.tocci.com.

in  0    y  0    f  0

Tags: New Jersey, Project Executive, Ray Barker, Tocci

## LEAVE A REPLY

Your email address will not be published. Required fields are marked *

Name*

Email*

Website

Comment

Post Comment

Follow On  Pint

ABOUT    APPROACH    PORTFOLIO    BLOG    CAREERS    CONTACT

years of building experience with a unique collaborative process to optimize the cost, design, and assembly of buildings that perform efficiently and delight users.

Tocci's team of passionate BIM professionals is driving steady growth with high-performance building software and tools. Read More [+]

the Tocci team. If you are interested in joining our team, check out ou...
https://t.co/KkQu62cnQy 12 Aug 2019

**Subscribe To Our Newsletter**

Email Address        Subscribe

**Tocci Begins Construction on Modular Pharmaceutical Building for Amgen**
Tocci Begins Construction on Modular Pharmaceutical Building for Amgen Woburn, MA (August 20, 2019) Tocci, working Read More [+]

Tocci is proud to have sponsored the 11th Annual SPARKS Buddy Run! #SPARKS #BMC #BMC_SPARK https://t.co/sOyKcuuce1 23 Jul 2019

c o o l   c a l m   constructed

Copyright © 2017 Tocci Building Corporation. Terms of Use

# Exhibit D

Case 3:16-cv-05422-PGS-TJB   Document 178-1   Filed 09/22/20   Page 47 of 55 PageID: 2480

ABOUT     APPROACH     PORTFOLIO     BLOG     CAREERS     CONTACT

# TOCCI HIRES INDUSTRY VETERAN GLYNDA WEHRING

## MEET TOCCI'S NEW TEAM MEMBER GLYNDA WEHRING

By Tocci   |   October 7th, 2015          Categories: **Tocci Bulletin**, **Tocci in the News**

## TOCCI BUILDING COMPANIES HIRES GLYNDA WEHRING AS SENIOR PROJECT MANAGER

*INDUSTRY VETERAN BRINGS DECADES OF PROJECT MANAGEMENT EXPERIENCE TO LEADING FIRM*



**WOBURN, MA (October 7, 2015)** – Tocci Building Companies (Tocci), a Boston-area construction management company and recognized leader in virtual design and construction solutions, has announced the addition of Glynda Wehring as Senior Project Manager. In her new role, Wehring will be overseeing projects in New Jersey markets including a 400-unit apartment development in East Brunswick, NJ. She will apply over 20 years of project management experience to the position, while working in collaborating with Tony Sandonato, Executive Vice President at Tocci.

Wehring's prior professional experience was with Lend Lease beginning as Project Manager and advancing to the role of Vice President. She has delivered new and renovated projects for the renewable energy, energy efficiency, education, commercial, and healthcare sectors. In continuing her

**SUBSCRIBE**

Subscribe To Our Newsletter

Email Address     Subscribe

# CATEGORIES

Tocci in the News

Tocci Bulletin

Awards

Corporate Giving

Training

Design We love

Industry News

VDC News

TocciToday

Q     SEARCH

ABOUT     APPROACH     PORTFOLIO     BLOG     CAREERS     CONTACT

As Tocci continues to grow and expand services in New Jersey and the region, it was essential to strength our senior leadership team with strong industry veterans like Glynda. With over 20 years of industry experience in a wide variety of construction projects, coupled with her LEED AP credentials, Glynda will become a valuable addition to our firm.

— Tony Sandonato

Wehring is affiliated with the New Jersey Chapter of the United States Green Building Council (USGBC/NJGCB) and she serves as a trustee for the Washington Township Land Trust. Wehring is a graduate of Texas A&M University and holds a LEED AP with Building & Construction certification.

## ABOUT TOCCI BUILDING COMPANIES:

Tocci Building Companies, a leading construction and project management firm, specializes in Virtual Design and Construction (VDC), Building Information Modeling (BIM), Highly Collaborative Project Delivery (HCPD$^{SM}$), and Integrated Project Delivery (IPD). Tocci was an early adopter of VDC in the Northeast and in 2006 committed to use it on all projects. In 2008, Tocci built the first IPD project in the Northeast and is now doing IPD across the country.

Tocci provides BIM-enabled building solutions and construction services with a sustainable approach and emphasis on lean construction. Headquartered in Woburn, MA, Tocci has a long history of design/build and highly collaborative delivery in the Northeast and Mid-Atlantic United States. For more information visit www.tocci.com

in  0     🐦 0     f  0        Tags: hire, New Jersey

Follow On 📌 Pint

## LEAVE A REPLY

Your email address will not be published. Required fields are marked *

Name*

Email*

Website

Comment

Post Comment

ABOUT    APPROACH    PORTFOLIO    BLOG    CAREERS    CONTACT

Tocci Building Corporation combines over ninety years of building experience with a unique collaborative process to optimize the cost, design, and assembly of buildings that perform efficiently and delight users.

**Subscribe To Our Newsletter**

| Email Address | Subscribe |

**VDC Specialist**

Tocci's team of passionate BIM professionals is driving steady growth with high-performance building software and tools. Read More [+]

**Tocci Begins Construction on Modular Pharmaceutical Building for Amgen**

Tocci Begins Construction on Modular Pharmaceutical Building for Amgen Woburn, MA (August 20, 2019) Tocci, working Read More [+]

We are pleased to welcome two new faces to the Tocci Team! If you are interested in joining our team, check out ou...
https://t.co/KkQu62cnQy 12 Aug 2019

Tocci is proud to have sponsored the 11th Annual SPARKS Buddy Run! #SPARKS #BMC @BMC_SPARK https://t.co/sOyKcuuce1 23 Jul 2019

c o o l   c a l m   constructed

Copyright © 2017 Tocci Building Corporation. Terms of Use

Case 1:21-cv-10388-PBS   Document 12-2   Filed 04/09/21   Page 51 of 56

# Exhibit E

Case 3:16-cv-05422-PGS-TJB   Document 176-1   Filed 05/22/20   Page 51 of 55 PageID: 2484



ABOUT     APPROACH     PORTFOLIO     BLOG     CAREERS     CONTACT

# EXECUTIVE TEAM



## JOHN TOCCI
Chief Enabling Officer


@JLTocci1

**Bio**

John leads Tocci Building Corporation. John is driven by a passion for improving the means of project delivery. His interest in providing better client service and developing more collaborative and productive relationships with designers and subcontractors has resulted in Tocci's early adoption and successful practice of today's most innovative built-environment initiatives.



**John Tocci**

Chief Enabling Officer



**Tony Sandanato**

Executive Vice President



**Joe Cavallaro**

Vice President



**Joe Ferolito**

Vice President Planning / Cost Engineering



**Lila Tocci**

Director of Company Life / Charitable Giving



**Bob Tierney**

General Superintendent



**Marvin Lahoud**

Project Performance Manager



**Paul Neenan**

Chief Financial Officer

## ABOUT

Tocci Building Corporation combines over ninety years of building experience with a unique collaborative process to optimize the cost.

## LATEST POSTS

**VDC Specialist**

## TOCCI TWEETS

We are pleased to welcome two new faces to the Tocci Team! If you are interested in joining



Tocci Begins Construction on Modular
Pharmaceutical Building for Amgen Woburn, MA
(August 20, 2019) Tocci, working Read More [+]

2019

c o o l  c a l m  constructed

Copyright © 2017 Tocci Building Corporation. Terms of Use

# Exhibit F



**1 OF 1 RECORD(S)**

FOR INFORMATIONAL PURPOSES ONLY
Copyright © 2019 LexisNexis
a division of Reed Elsevier Inc. All Rights Reserved.
Report Created: May 16, 2019 - Thursday 2:29 PM

# Massachusetts Secretary of State

## Corporate Filing
### Business Information

|  |  |
|---|---|
| **Filing Type:** | CURRENT |
| **Filing Number:** | 201332442 |
| **Name:** | TOCCI RESIDENTIAL, LLC |
| **Name Type:** | LEGAL |
| **STANDARD BUSINESS Address:** | 660 MAIN ST<br>WOBURN, MA 01801-8407 |
| **ORIGINAL BUSINESS Address:** | 660 MAIN ST<br>WOBURN, MA 01801<br>US |

|  |  |
|---|---|
| **TIN:** | 20-1332442 |
| **Business Type:** | DOMESTIC LIMITED LIABILITY COMPANY (LLC) |
| **Status:** | INACTIVE |
| **Status Date:** | 05/04/2007 |
| **Place Incorporated:** | MASSACHUSETTS |
| **Date Incorporated:** | 07/08/2004 |
| **Foreign/Domestic:** | DOMESTIC |
| **Partnership:** | NO |
| **Additional Information:** | ANNUAL REPORT REQUIRED: YES RESIDENT AGENT: YES |
| **Status Comment:** | CONSOLIDATED |
| **Date Last Seen:** | 05/07/2019 |

### Registered Agent

|  |  |
|---|---|
| **Name:** | TOCCI, JOHN L |
| **Registered Agent Address** | 660 MAIN ST<br>WOBURN, MA 01801-8407 |
| **Registered Agent Information:** | ANNUAL REPORT REQUIRED: YES RESIDENT AGENT: YES |

## Annual Report Filings
### Filing 1

|  |  |
|---|---|
| **Filing Year:** | 2006 |
| **Filed Date:** | 04/24/2007 |
| **Filing Number:** | 200783646910 |
| **Comments:** | ANNUAL REPORT REQUIRED: YES |

### Filing 2

|  |  |
|---|---|
| **Filing Year:** | 2005 |
| **Filed Date:** | 06/22/2005 |
| **Filing Number:** | 200519484410 |
| **Comments:** | ANNUAL REPORT REQUIRED: YES |

## Officers

## Officers

| | |
|---|---|
| **Name:** | TOCCI, JOHN L |
| | Title:MANAGER |

| | |
|---|---|
| **Standard Address:** | Type:BUSINESS |
| | 660 MAIN ST |
| | WOBURN, MA 01801-8407 |
| **Original Address:** | 660 MAIN ST |
| | WOBURN, MA 01801 |
| | US |

## Filing History

| | |
|---|---|
| **Filing Date:** | 05/04/2007 |
| **Filing Type:** | SUBMISSION |
| **Ref No:** | 200783745460 |
| **Description:** | CERTIFICATE OF CANCELLATION |

| | |
|---|---|
| **Filing Date:** | 07/08/2004 |
| **Filing Type:** | SUBMISSION |
| **Ref No:** | 200476374870 |
| **Description:** | CERTIFICATE OF ORGANIZATION |

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. In addition, Industry Classifications and Normalized Titles are data elements automatically derived and unverified. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use: Litigation
Your GLBA Permissible Use: I have no permissible use
Copyright© 2019 LexisNexis. All rights reserved.

---

End of Document